Andrew M. Calamari
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,            :
                                                :
                                Plaintiff,      :
                                                :       16 Civ. _____ (___)
                - against -                     :
                                                :       COMPLAINT
                                                :
JAY MAC RUST and CHRISTOPHER K.                 :
BRENNER,                                        :       ECF CASE
                                Defendants.     :
                                                :       JURY TRIAL DEMANDED
                                                :
-----------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint

against Jay Mac Rust ("Rust") and Christopher K. Brenner ("Brenner") (together, "Defendants"),

alleges as follows:

### SUMMARY OF ALLEGATIONS

1.      This case involves a scheme to defraud, orchestrated by Individual X, a convicted

felon and recidivist securities law violator, and his alter ego Atlantic Rim Funding ("Atlantic").

Defendants are two attorneys whom Individual X separately enlisted to serve, successively, as

purported "escrow agents" to help defraud 29 small business owners of deposits they made in

1

purported escrow accounts.  Defendants led these small business owners to believe that their escrow deposits would be used to help secure small business loans through Atlantic in amounts equaling approximately ten times the amounts deposited.  In all, these unwitting victims deposited approximately $13.8 million with Defendants as escrow agents from approximately December 2010 to March 2012.  Defendants misappropriated significant portions of the funds entrusted to them, and commandeered the remainder for their own undisclosed trading in speculative securities derivatives.

2.      During their involvement with Atlantic's purported loan-funding process, Rust (from December 2010 until approximately August 2011) and then Brenner as his successor (from September 2011 until March 2012), acting as purported escrow agents, repeatedly and consistently assured prospective borrowers of the safety of funds deposited into Defendant's respective escrow accounts.  Each Defendant told prospective escrow clients that if they deposited cash with him in the amount equal to ten percent of the loan requested, he would use the escrowed funds only to purchase securities that were safe and liquid, and that Atlantic would then "leverage" these securities to obtain commercial loans for the borrowers ten times the size of their deposits.  Rust and Brenner each assured his escrow clients that, upon either Atlantic's successful funding of the loans or its failure to procure the loans, the escrow clients would receive their cash deposits back promptly.

3.      Defendants, however, knew these assurances were false or acted with reckless disregard for the truth.  Contrary to their respective assurances, neither Rust nor Brenner intended to invest client cash to purchase safe, liquid securities, and neither did so.  Rather, each intended

to, and did, secretly misappropriate some portion of his escrow clients' deposits to pay himself, Individual X, and others in amounts totaling more than $662,000 in the case of Rust and at least $595,000 in the case of Brenner. With respect to client money that Defendants did not misappropriate, each Defendant sought to maximize his own return by investing in highly speculative and risky securities, contrary to the assurances each had made to his clients.

4.      To this end, Rust and then Brenner each opened numerous securities accounts at broker-dealers, representing to the broker-dealers (contrary to their assurances to their escrow clients) that the investment objectives and risk exposures were "speculative" and "aggressive." To avoid scrutiny by the broker-dealers of his unlawful use of client funds for his own speculative purposes, Rust and then Brenner each repeatedly lied to these broker-dealers, claiming that the money used to trade in the speculative securities in the trading accounts was his own, and not funds entrusted to each of them by escrow clients.

5.      Rust and Brenner each then used client money to purchase speculative securities derivatives, with no prior notice, and in contradiction of his oral and written assurances to escrow clients.

6.      Atlantic was unable, or never had any intention, to obtain any loans for any escrow client of Rust or Brenner, a fact that became apparent to each not long after his respective association with Atlantic began. Each Defendant nonetheless continued to seek and obtain monies from new escrow clients through materially false and misleading representations and omissions, even while each continued to:  (1) siphon a portion of his escrow clients' money to himself and others, and (2) gamble on risky securities derivatives with the remainder.

7.     When earlier escrow clients inevitably began demanding the return of their deposits, Rust and then Brenner could not comply because each had misappropriated a significant portion of those funds and had purchased illiquid and volatile securities with the remainder. Thus, as early as May 2011, Rust secretly began using deposits from newly-recruited escrow clients to repay earlier escrow clients who had demanded refunds, as Brenner also eventually did when he found himself in the same situation beginning no later than December 2012.  Indeed, even as escrow clients' demands continued to mount and go unsatisfied, Rust and then Brenner each continued to misappropriate client funds, even after each had abandoned recruiting new escrow clients:  for Rust, as late as March 2012, and for Brenner, as late as July 2012.

8.     As a result of each Defendant's respective misconduct, their escrow clients collectively suffered more than $6 million in losses.

## VIOLATIONS

9.     By virtue of the conduct alleged herein, Rust and Brenner, directly or indirectly, have engaged, are engaging, and unless restrained and enjoined will continue to engage, in conduct, acts, practices, and courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred on it by

Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking to permanently restrain and

enjoin Rust and Brenner from engaging in the conduct, acts, practices, and courses of business

alleged herein, and for such other equitable relief as may be appropriate or necessary for the

benefit of investors.

11.     The Commission also seeks a final judgment ordering Defendants to disgorge

their ill-gotten gains and pay prejudgment interest thereon and to pay civil money penalties

pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and

78aa].  Defendants, directly or indirectly, have made use of the means or instruments of

transportation or communication in, and the means or instrumentalities of, interstate commerce,

or of the mails, in connection with the transactions, acts, practices, and courses of business

alleged herein.  Some of these transactions, acts, practices and courses of business occurred in

the Southern District of New York.  Defendants executed and cleared many of the securities

trades at issue in this proceeding through broker-dealers located in the Southern District of New

York.  Defendants also made materially false and misleading statements to broker-dealers, some

of which have their principal places of business in the Southern District of New York.

## DEFENDANTS

13.     **Rust,** age 41, is a resident of Stephenville, Texas, and is an attorney licensed to practice law in Texas.  From December 2010 to at least August 2011, Rust acted both as Atlantic's attorney and as escrow agent for individuals and businesses whom Rust misled into depositing cash with him.

14.     **Brenner,** age 66, is a resident of Katy, Texas.  Brenner is an attorney licensed to practice law in Texas and in Colorado and he maintains a law practice in both states.  Brenner is also a licensed accountant in Texas.  In June 2009, the Colorado Division of Securities enjoined Brenner for violations of the registration requirements of the Colorado Securities Act in connection with his involvement in a private offering of securities conducted by Equity Edge Companies LLC, an investment company for whom Brenner served as outside counsel and Chief Financial Officer.  *Securities Commissioner for the State of Colorado v. Equity Edge, LLC et al,* 07CA0523 (July 24, 2008 Colo. App.).  From September 2011 through at least March 2012, while residing and maintaining a business office in Colorado, Brenner acted as Atlantic's attorney and as escrow agent for Atlantic and individuals and businesses whom Brenner misled into depositing cash with him.

## RELEVANT ENTITY AND INDIVIDUAL

15.     **Atlantic** is a Colorado corporation and the alter ego of Individual X.

16.     **Individual X** is currently serving a twenty-year prison sentence in California as the result of a criminal case filed by the California Attorney General's office for securities fraud in an unrelated matter.

## FACTS

### Rust Agrees to Fraudulently Obtain Escrow Deposits.

17.     In November 2010, Individual X sought and obtained Rust's agreement to act as escrow agent for the commercial loan program he was ostensibly operating through his alter ego, Atlantic.

18.     In 2008, Rust had purported to act as Individual X's escrow agent in a different venture, in which Rust disbursed to Individual X, Individual X's wife, and others approximately $650,000 he had received from two individual investors located in New Jersey in exchange for promissory notes and other assurances of payment Individual X had made to these investors.  By no later than March 23, 2011, Rust learned that these investors had sued Rust and Individual X in federal court in New Jersey (the "New Jersey Action"), alleging that they had received no payments on the promissory notes and that Individual X had reneged on his guarantees – allegations that Rust confirmed were true when he spoke with Individual X on or about that date.

19.     Individual X explained to Rust in November 2010 that the borrowers in his new program, operated through Atlantic, would deposit cash amounting to ten percent of their anticipated loans with Rust as escrow agent, and Rust would then use those funds to purchase securities that Atlantic claimed it would leverage to obtain a loan for the escrow client in an amount ten times the size of the deposit.

20.     Individual X explained to Rust that Rust's participation as escrow agent was important to persuade his prospects that their funds would be safe during the transaction and that Rust was to emphasize that he (Rust) was acting on the escrow clients' behalf and that he would

protect them by remaining in control of their deposits, the securities ostensibly purchased with their cash, and even the loan proceeds.

21.     However, both Rust and Individual X understood that, contrary to what Rust would be telling investors, Rust would use their money to enrich himself, Individual X and others.  According to an "Attorney Fee Agreement," dated December 10, 2010, Rust and Individual X secretly agreed that Rust would be entitled to any interest from the funds deposited with Rust, as well as "3% of Atlantic's profits from all amounts in trade associated with any collateral or funds generated pursuant to the services provided by [Rust] which shall be a minimum of $15,000 per month, but not more than the maximum of $100,000 per month from the date the first CMO [collateralized mortgage obligation] is purchased."  In addition, under this agreement, Rust was to distribute "profits" from the deposited funds to Atlantic and its members according to instructions to be provided to him by Atlantic.

<b>Rust Fraudulently Induces Escrow Clients<br>Through Material Misrepresentations and Omissions.</b>

22.     Beginning in December 2010, and continuing to approximately August 2011, Rust and Individual X induced at least thirteen small business owners to deposit a total of approximately $8.5 million with Rust as escrow agent, knowingly or recklessly not disclosing to them the Attorney Fee Agreement and Rust's (and Individual X's) intention to personally profit from the escrow deposits, and, from at least March 23, 2011, Rust also knowingly or recklessly failed to disclose the New Jersey Action filed against him and Individual X by investors concerning an earlier scheme.

23.     Rust required each of his escrow clients to sign a "Cash Escrow Agreement" that he prepared and gave them, also signed by Rust and Atlantic.  Although the terms of the Cash Escrow Agreements varied from client to client, they were drafted so as to induce depositors to believe in the safety and liquidity of their escrow deposits until the loan funding effort concluded, either successfully or unsuccessfully.  The Cash Escrow Agreement typically stated that, in return only for nominal transaction-handling fees (e.g., $40 or $50 per deposit, wire or other transaction), Rust would hold all deposited funds in  various designated trust accounts at a named bank, in "U.S. Government backed securities," or in "U.S. Treasury Bills" or "U.S. government-backed instruments."

24.     In addition, the Cash Escrow Agreement typically included an "Exhibit A" that explicitly represented to depositors that their deposits would be returned within a few days of the funding deadline (typically 45 or 60 days), whether or not Atlantic had been successful in funding a loan.  Exhibit A also typically assured escrow clients that the securities purchased with their deposits would be safe and liquid, stating that that Atlantic would obtain a credit line and the collateral for the loan "with securities backed by the United States Government or collateral satisfactory to establish the stated credit line," which Rust would obtain and hold for the escrow client.  Rust also participated in numerous telephone calls and meetings with prospective escrow clients and their representatives in which, knowingly or recklessly, he falsely assured escrow clients that their deposits would be safe from loss pending the conclusion of the loan-funding process.  For example:

a.      On or about December 24, 2010, during a conference call with an attorney for an escrow client located in Zillah, Washington ("Escrow Client A"), Rust stated that the escrow client's deposit would be used to purchase "government backed commercial real estate securities," which Rust could liquidate within three to four days.  Escrow Client A then signed a Cash Escrow Agreement as described above and deposited $900,000 with Rust on or about March 4, 2011.

b.      On or about May 6, 2011, another escrow client ("Escrow Client B"), located in Austin, Texas, deposited $300,000 with Rust pursuant to a Cash Escrow Agreement as described above.  Subsequently, Rust sent Escrow Client B a form to sign authorizing the release of those funds to purchase a security Rust represented to be "US Government backed SBA [Small Business Administration]," and Escrow Client B signed the authorization form on or about May 17, 2011.

c.      In December 2010, Rust told a representative for another escrow client ("Escrow Client C"), located in Elkins Park, Pennsylvania, that the client's deposit would be used to purchase U.S.-backed agency or treasury bonds.  Escrow Client C then signed a Cash Escrow Agreement as described above and deposited approximately $600,000 with Rust on May 6, 2011.

25.     Rust also lied to intermediaries who, apparently unaware of Individual X's and Rust's scheme, introduced prospective escrow clients to Rust.  Rust knew this false and

misleading information would be conveyed to those prospective escrow clients.  In the spring of 2011, Rust represented to the principal of one such intermediary, "Intermediary A," located in The Woodlands, Texas, that escrow funds would be held either in cash or "AAA-rated SBA bonds."  Intermediary A conveyed this information to two clients ("Escrow Client D" and "Escrow Client E"), who were located in Tomball, Texas and Katy, Texas, respectively.  On June 7, 2011, Escrow Client D deposited $520,000 into Rust's account, and on June 16, 2011, Escrow Client E deposited $310,000.

26.     Rust's representations in his Cash Escrow Agreements, telephone calls and meetings with intermediaries and escrow clients were materially false and misleading, and Rust, who owed a fiduciary duty to his escrow clients, made these material false statements knowing or recklessly disregarding that they were false and misleading.  Rust knowingly or recklessly misled clients and intermediaries to believe that their funds would be protected during the purported loan funding process and would be used to purchase securities that were safe and liquid and thus could be returned readily within the short deadlines explicitly set forth in the Cash Escrow Agreements that Rust drafted and signed.

27.     Rust's actual intention – which he knowingly or recklessly omitted to disclose to escrow clients – was to steal a portion of the deposits outright, for distribution to himself, Individual X and others, according to Rust's secret agreement with Individual X, even though Rust owed these escrow clients a fiduciary obligation of loyalty and good faith.  Rust also knowingly or recklessly omitted to disclose to his escrow clients that as to the portion of his escrow clients' money that he did not steal outright, Rust intended to, and did, purchase risky and

illiquid, but high-yielding securities derivatives – not the safe, liquid "AAA-rated" and/or

"government-backed" securities he led his escrow clients to believe he would purchase with their

money. The objective was to try to make money for himself and Individual X, while putting all

of the risk on his escrow clients.

**Rust Misleads Broker-Dealers to Conceal and Perpetuate His Fraudulent**
**<u>Scheme of Speculative Securities Trading with His Escrow Clients' Deposits.</u>**

28.     In January 2011, Rust opened a brokerage account under the name "J. Mac

Investment Trust" with a broker-dealer having its principal place of business in New York, New

York ("Broker-Dealer A"). Rust confirmed in writing to his registered representative that his

investment profile, in contrast to his assurances to his escrow clients, was "Aggressive Growth –

focus is on generating growth and/or income with a willingness to assume a high level of risk."

29.     Rust also knowingly and falsely represented to Broker-Dealer A that the source of

the funds he would be trading was "business/self-employment," nowhere disclosing that the

money he would be using for his aggressive trading belonged to his escrow clients. Consistent

with the high-risk profile under which he opened the account at Broker-Dealer A, Rust

exclusively purchased risky and illiquid securities derivatives called "SBA Confirmation of

Originator Fee Certificates," also known as "SBA COOFs." The particular certificates Rust

purchased were held in trust and administered by a Delaware limited liability company, with

offices in Austin, Texas. Rust purchased the SBA COOFs in two different series, one issued in

2010 and the other in 2011. The Private Placement Memorandum ("PPM") for each series

described the issuer of the securities, the terms of the offering, and the risks of the investment,

among other things.

30.     SBA COOFs are securities derivatives that are not SBA-guaranteed bonds and
carry no meaningful government guarantee, a fact that is clear from, among other things, the
PPMs themselves.  Rather, they entitle the holder to a portion of only the monthly interest
payments "stripped" from the SBA-guaranteed portion of a specified, underlying loan.  As such,
SBA COOFs are subject to substantial fluctuations in value, including a total loss of the
investment, depending on, among other things, changes in interest and pre-payment rates.

31.     Contrary to Rust's assurances to his escrow clients, the PPMs also stated that the
SBA COOFs were not "AAA" rated and, in fact, would not be rated at all when issued – a fact
that was regularly reported to Rust in Broker-Dealer A's trade confirmations sent to Rust
beginning no later than mid-March 2011.

32.     Rust knew or was reckless in not knowing that SBA COOFs were highly risky and
illiquid securities, which is why Rust, for example, selected "Aggressive Growth" as his
investment profile on account-opening documents (while pointedly leaving "Preservation of
Capital" unselected).  For similar reasons, Rust knowingly and falsely misled Broker-Dealer A to
believe that Rust was using his own funds, not his escrow clients' money, to engage in this
speculative trading.

33.     In addition, the registered representative on his account at Broker-Dealer A told
Rust before he began trading in these derivatives that they were volatile and risky and did not
benefit from the SBA guarantee of the underlying loans to which they referred.  Broker-Dealer A
also required Rust to sign a form entitled "Acknowledgment Regarding Illiquid Investments
Transaction" before it would execute his transactions in New York in these SBA COOFs.  In

these forms, Rust acknowledged in writing, among other things, that Broker Dealer A could not make a "determination regarding the fairness, sufficiency or competitiveness" of the pricing of the transaction.

34.     Furthermore, the PPMs (which Rust possessed no later than June 2, 2011) described the various risks associated with the SBA COOFs.  The PPMs for both the 2010 and 2011 series stated that, "there is currently no secondary market for the offered certificates, and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide holders … with liquidity … ."  Both PPMs also noted the prepayment risks inherent in the SBA COOFs and, in particular, that in high prepayment scenarios, investors in the SBA COOFs may "lose all or a substantial portion of their investment."  Both PPMs also noted that the certificates were not rated by any rating agency.  The 2011 series PPM also disclosed that the SBA COOFs "will not be guaranteed or insured by any governmental agency or instrumentality (including the SBA)…."  Rust also knew or recklessly disregarded from the PPMs, and the trade confirmations he received as early as mid-March 2011 from Broker-Dealer A that, contrary to his representations to his escrow clients, the SBA COOFs were not "AAA" rated, but were in fact unrated at all relevant times and that the value of the SBA COOFs were subject to the risk of accelerated pre-payments.

35.     From January 2011 to August 2011 Rust used $3.2 million obtained from his escrow clients to purchase SBA COOFs through Broker-Dealer A, located in New York, New York, whose securities transactions were cleared in Minneapolis, Minnesota.

36.     At no time before he purchased these SBA COOFs did Rust disclose the

acknowledgments he provided to Broker-Dealer A to his escrow clients.  Nor did he disclose (1)

the explicitly speculative profile he had selected for the account he opened with their money; (2)

the warnings his registered representative gave him about the SBA COOFs; or (3) that the SBA

COOFs securities he claimed to his escrow clients were "AAA-rated," "government-backed" and

safe and liquid were in fact not rated at all, were volatile and illiquid, and were not guaranteed.

These were material omissions, and Rust knowingly or recklessly failed to disclose these facts to

his escrow clients before they entrusted their funds to him.

37.     Beginning in May 2011, Rust began using a different broker-dealer ("Broker-

Dealer B"), with its principal place of business in Davie, Florida, primarily to handle his

speculative trading in the SBA COOFs with escrow client funds.  To continue to avoid scrutiny

about the obvious unsuitability of purchasing these risky derivatives with his escrow clients'

deposits, Rust lied to Broker-Dealer B about the source of these funds.  Rust materially and

knowingly or recklessly misrepresented to Broker-Dealer B on an account opening form that the

sources of his funds were "Investments," "Business Revenue," and "Sale of Business Property,"

while knowingly omitting to mention that he was actually, and exclusively, using other peoples'

escrow deposits.  As with Broker-Dealer A, Rust selected "Growth," not "Preservation of

Capital," as his investment objective, and he described his risk exposure as "aggressive" on the

account-opening form.

38.     The registered representative on Rust's account at Broker-Dealer B also explained

to Rust, as had the representative on his account at Broker-Dealer A, that the SBA COOFs were

risky and illiquid securities that did not benefit from a government guarantee. Consistent with that warning, Broker-Dealer B, like Broker-Dealer A, insisted on written acknowledgments from Rust before each transaction it executed for him in the SBA COOFs.

39.     In these acknowledgments, Rust explicitly confirmed that the SBA COOFs were "complex instruments" that could be "volatile and illiquid in adverse market conditions." On each of these forms, Rust also explicitly acknowledged having received the PPM for the SBA COOFs in question. Each of Rust's acknowledgments to Broker-Dealer B represented that he (Rust) was an "accredited investor" with a yearly income of over "$200,000 for the past 2 years," and with a net worth exceeding $1 million. Rust's statements were knowingly and materially misleading to Broker-Dealer B because (especially combined with Rust's initial misrepresentations as to the source of funds) they concealed from Broker-Dealer B the unsuitability of these risky investments for the true (unknowing) investors in the SBA COOFs – Rust's escrow clients.

40.     The trade confirmations Rust received for the 2010 SBA COOFs, as early as June 3, 2011, further disclosed (as had Broker-Dealer A's earlier trade confirmations) that these derivatives were not rated, which was contrary to Rust's assurances to escrow clients.

41.     Rust persisted in lying to Broker-Dealer B as to the source of the funds he was using in his account as late as August 24, 2011. Broker-Dealer B had noticed a series of wire transfers coming into Rust's account and directly asked Rust, in an email on that date, if any of the money in his account represented "pooled" money from investors, and he asked Rust to complete a written form as to the source of funds. Rust again lied in a responsive email, falsely

claiming – again – that none of the funds represented "pooled" funds and that the funds

constituted his "personal portfolio of funds."  In fact, all of the funds in Rust's account at Broker-

Dealer B belonged to his escrow clients.

42.    From May 2011 to August 2011, Rust used $1.5 million obtained from his escrow

clients to purchase SBA COOFs through Broker-Dealer B, located in Davie, Florida, and whose

securities transactions were cleared in Omaha, Nebraska.

43.    At no time before he purchased these SBA COOFs through Broker-Dealer B did

Rust disclose to his escrow clients the acknowledgments he provided to Broker-Dealer B.  Nor

did he disclose (1) the aggressive profile he had selected for the account he opened with their

money; (2) the warnings his registered representative gave him about the SBA COOFs; or (3)

that the SBA COOF securities he claimed to his escrow clients were "AAA-rated," "government-

backed" and safe and liquid were in fact not rated at all, were volatile and illiquid, and not

guaranteed.  These were material omissions, and Rust was knowing or reckless in not disclosing

these facts to his escrow clients.

### Rust Secretly Misappropriates Escrow Deposits For Himself and Others.

44.    Beyond nominal fees for wire transaction and similar charges, Rust represented to

his escrow clients that he would take no other compensation or fees from the escrow deposits he

received.  But, contrary to these representations, Rust intended to, and did, use his escrow

clients' deposits to enrich himself and others by misappropriating substantial portions of their

deposits, as well as interest income and any trading profits, even while aware that Atlantic either

never intended, or was unable, to complete funding for a single escrow client.  For example, on

December 31, 2010, one client, located in Reno, Nevada ("Escrow Client F"), whom Rust induced to participate in his scheme, deposited $449,990 with Rust. On January 19, 2011, Rust transferred a portion of these funds, $385,015, to Broker-Dealer A to purchase the SBA COOFs discussed above. Rust, without disclosure to Escrow Client F, transferred the remaining $63,985 to himself, Individual X and others.

45.     Rust continued this scheme of undisclosed misappropriation from escrow clients through as late as March 2012, long after his escrow clients had demanded refunds of their deposits, upon Atlantic's consistent failure to procure any loans. Indeed, from the $8.5 million Rust induced thirteen escrow clients to deposit in escrow in the period from December 2010 to August 2011, Rust misappropriated more than $224,000 for himself on a steady and repeated basis – making the last payment to himself as late as February 2012. Rust similarly diverted approximately $438,000 to Individual X and others on a steady and repeated basis – transferring his escrow clients' cash to them as late as March 2012.

### Rust Secretly Uses New Escrow Client Deposits to Repay Earlier Escrow Clients.

46.     As Atlantic never procured any loans for Rust's escrow clients, it was not long after December 2010 that escrow clients began demanding the return of their deposits. Rust, however, had meanwhile misappropriated a portion of his escrow clients' money outright and purchased the risky SBA COOFs with the remainder. Rust either could not sell these derivatives at a sufficiently high price, or preferred not to sell, so that he could continue to receive the lucrative stream of interest income he had concealed from his escrow clients.

47.     To keep the fraudulent scheme going, by no later than March 2011, Rust began to use new deposits in whole or in part to reimburse earlier depositors, without disclosing this misuse of proceeds to his existing or prospective escrow clients.

48.     For example, Escrow Client A (see ¶ 24(a) above), had deposited $900,000 in escrow funds with Rust on March 4, 2011.  Without disclosure to Escrow Client A, Rust paid himself $17,000 of that escrow client's money on March 14, 2011 and paid $17,000 to Individual X (via Individual X's wife) and another individual.  Rust transferred approximately $380,000 of Escrow Client A's deposit to Broker-Dealer A to purchase the SBA COOFs, on March 15, 2011.

49.     Then, on March 29, 2011, without disclosure to Escrow Client A, Rust transferred the approximately $450,000 balance of Escrow Client A's money to Escrow Client F, an earlier depositor (see ¶ 44, above) that, upon Atlantic's failure to procure a loan, had previously demanded the return of its deposit.

50.     By April 20, 2011 (after Rust continued to misappropriate even more of Escrow Client A's money), only $41.33 of its original deposit remained in Rust's bank account.  Rust was thus unable to return Escrow Client A's money when it demanded reimbursement.   On May 6 and May 9, 2011, Rust replenished the account with escrow funds from two *new* escrow clients – $300,000 from Escrow Client B (see ¶ 24(b) above) and $600,000 from Escrow Client C (see ¶ 24(c) above), respectively.

51.     As noted above, Rust had lied to both of these escrow clients regarding the nature of the securities he was purportedly buying for them.  However, Rust did not buy *any* securities

at all with their money.  Instead, without disclosure to Escrow Clients B or C, Rust immediately

used their money to refund Escrow Client A, on May 19, 2011.

52.     Rust continued his fraudulent efforts to bring in newly-recruited escrow funds in

order to repay his earlier victims until at least as late as August 3, 2011, when he emailed

Individual X about his hopes of shortly bringing in "some additional funds" that would "stem the

tide" of demands for refunds.

53.     In addition to the thirteen escrow clients discussed above, Rust fraudulently

induced another prospective borrower ("Escrow Client G"), located in Columbus, Ohio, to

deposit $2 million with him on or about August 1, 2011.  Escrow Client G's Cash Escrow

Agreement, dated July 11, 2011, contained additional representations from Rust that it had asked

Rust to include.  Although other of Rust's cash escrow agreements allowed him to commingle

depositors' funds in the same escrow account, Rust represented that Escrow Client G's deposit

would be placed in a separate escrow account used solely for Escrow Client G.  Rust also

represented that before Escrow Client G would be obligated to advance its $2 million deposit,

Rust would confirm that Atlantic had deposited in an account established solely for Escrow

Client G "U.S. government issued securities that have a current market value of no less than One

Hundred Million Dollars."  This was material to Escrow Client G, as it would demonstrate

Atlantic's seriousness in the loan transaction.  For the same reasons, Rust also represented in the

Cash Escrow Agreement that once Escrow Client G made its deposit, Rust would confirm

(within three days) that Atlantic had deposited an additional $500,000 in cash or "equity in

Atlantic's Bond holdings."  Rust's representations were material and false, and he knew or was

reckless in not knowing they were false.  Rust had no intention of depositing Escrow Client G's funds in a separate, non-commingled account.  Rust also knew that Atlantic did not have securities worth $100 million, nor $500,000 in cash or equity in bond holdings, facts he expressly conveyed to Individual X – but not Escrow Client G – in an email to Individual X on July 11, 2011, the same date he induced Escrow Client G to sign the Cash Escrow Agreement.  In this same email to Individual X, Rust also expressed concern  that Escrow Client G would bring legal action when Atlantic's inability to perform became clear, and asked Individual X, "[d]o you need this one that bad?"

54.     Rust continued to deceive Escrow Client G after the Cash Escrow Agreement was signed to ensure that Rust received its $2 million cash deposit.  To mislead it into believing that Atlantic had deposited the required $100 million in securities in a segregated account, Rust emailed Escrow Client G on July 19, 2011 with trade confirmations and statement excerpts from Broker-Dealer A purporting to show that securities in that amount had been placed in a brokerage account that Rust falsely and expressly assured him would be used solely for Escrow Client G's benefit.  But, as Rust knew, the account in question was not a segregated account for Escrow Client G; it was the account Rust had established in his own name at Broker-Dealer A to trade in SBA COOFs with all of his escrow clients' money, for his own and Individual X's benefit.  Rust also knew or was reckless in not knowing that the securities he referenced and described in his email to Escrow Client G were not worth $100 million and that the trade confirmations he attached did not reflect securities purchased by or placed in his account by Atlantic, but rather reflected SBA COOFs Rust had earlier purchased with other escrow clients' money, and which

were purportedly being held for the benefit of those other escrow clients. And he also knew, or was reckless in not knowing, that at the time he emailed Escrow Client G, he had already transferred those securities out of the account entirely, the month before.

55.    On August 2, 2011, the day after Escrow Client G made its $2 million deposit with Rust, Rust emailed Escrow Client G, and knowingly or recklessly falsely assured it that Atlantic had "allocated another bond to your account" to cover the $500,000 requirement in the Cash Escrow Agreement.  But later in August, without disclosure to Escrow Client G, Rust transferred  $755,000 of its deposit to Rust's account at Broker-Dealer B, which (contrary to Rust's representations) held funds and securities purchased with other escrow clients' money.

### Brenner Replaces Rust as Escrow Agent

56.    In early August 2011, Individual X approached Brenner to replace Rust as Atlantic's attorney and escrow agent.  At that time, Brenner was already representing (as an attorney) an Atlantic client that had deposited $500,000 with Rust in mid-July 2011, and which, like all of Rust's escrow clients, had not received any loan funds from Atlantic.  Brenner was familiar with Atlantic's lending program by reason of the foregoing and from conversations with Rust and Individual X.

57.    Brenner agreed to replace Rust as escrow agent for Atlantic's program in or about September 2011.  As when Rust was the escrow agent, Brenner understood that borrowers would deposit cash amounting to ten percent of their anticipated loans with Brenner as escrow agent, which Brenner would then use to purchase securities that Atlantic supposedly would leverage to obtain loans ten times the size of the deposits.

58.     Brenner understood at this time that his role, in part, was to assure potential participants that their funds would be safe during the purported loan-funding process, with Brenner in control, ostensibly on their behalf, of their cash and any securities purchased with their cash.

59.     Brenner, however, intended from the outset to personally profit from escrow deposits placed with him, and he reached an oral agreement with Individual X when he replaced Rust that he would be entitled to divert a substantial portion of those funds, including any interest income and trading profits, to himself and others, at Individual X's direction.

### Brenner Fraudulently Induces Escrow Clients Through Material Misrepresentations and Omissions.

60.     From September 2011 through March 2012, Brenner and Individual X solicited and raised approximately $3.4 million from 15 new escrow clients.  Brenner also agreed to escrow assets previously held by Rust, including the $500,000 that Brenner previously deposited with Rust on behalf of Brenner's client.

61.     Brenner acted as escrow agent in these transactions and falsely assured escrow clients that he would protect their funds either by maintaining control of them or by investing in safe and liquid securities.  At no time before these escrow clients placed their cash with Brenner did Brenner disclose his intention to personally profit from their escrow funds, nor his agreement with Individual X to misappropriate their funds outright, for himself, Individual X and others.

62.     Beginning in late September 2011, Individual X told Brenner that he no longer preferred to contract directly with borrowers, and that he had enlisted Intermediary A to become the nominal lender in the Cash Escrow Agreements in place of Atlantic.  Intermediary A was

thus substituted for Atlantic in the Cash Escrow Agreements for nine of the escrow clients for which Brenner acted as escrow agent.  Notwithstanding the foregoing, Brenner and many escrow clients understood that Atlantic was still responsible for advancing the loan funds to Intermediary A.  For its part, Intermediary A appears to have been unaware of Individual X's and Brenner's scheme.

63.     Brenner required each of his escrow clients to sign a "Cash Escrow Agreement" and special escrow instructions, attached as "Exhibit A" to the "Cash Escrow Agreement." Brenner prepared these agreements, which Brenner and Atlantic or Intermediary A signed. Although the terms of the Cash Escrow Agreements varied to some degree from client to client, they were drafted so as to induce depositors to believe in the safety and liquidity of their escrow deposits until the loan funding effort concluded, either successfully or unsuccessfully.

64.     "Exhibit A," for example, typically assured escrow clients that the securities purchased with their deposits would be safe and liquid, stating that Atlantic would obtain a credit line and the collateral for the loan "with securities backed by the United States Government or collateral satisfactory to establish the stated credit line," which Brenner would obtain and hold for the escrow client.  "Exhibit A" also explicitly represented to depositors that their deposits, with accrued interest, would be returned within a few days of the funding deadline (typically 90 or 120 days), whether or not Atlantic had been successful in obtaining loan proceeds.

65.     Brenner also communicated and participated in telephone calls and meetings with Intermediary A, escrow clients and their representatives in which, consistent with the Cash Escrow Agreements, he falsely assured them that escrow deposits would be safe from loss

pending the conclusion of the loan-funding process, and he failed to disclose that he would use their funds to purchase risky or illiquid securities.  For example:

      a.      Brenner told Intermediary A and some or all of the nine escrow clients for which it was acting as sub-lender, that escrow clients' funds would not be at risk and would be used to buy "AAA SBA bonds."  These escrow clients deposited a total of $1,838,500 with Brenner during the period September 20, 2011 to March 22, 2012.

      b.      On September 21, 2011, Brenner assured a prospective escrow client, "Escrow Client H," located in Virginia Beach, Virginia, that his deposit would be used only to purchase bonds that were liquid.  On October 12, 2011, Escrow Client H signed a Cash Escrow Agreement and deposited $592,350 with Brenner.

      c.      On November 20, 2011, Brenner provided a prospective escrow client with a letter stating that Brenner held "SBA Collateralized Mortgage Obligations" in connection with six commercial loan transactions that he was handling and that he uses funds placed in escrow by these borrowers to "purchase the above-referenced, or similar, AAA government backed securities."

66.      Brenner's statements in his Cash Escrow Agreements and in telephone calls and meetings with Intermediary A and escrow clients, were false and misleading, and Brenner made them knowing they were false and misleading, or with reckless disregard for their truth or falsity. Brenner's representations were designed to, and did, create the misimpression that escrow

clients' funds would be used to purchase securities that were safe and liquid, and thus appropriate to the short-term loan funding process contemplated in the Cash Escrow Agreements that Brenner drafted.

67.    In reality, Brenner intended to, and did, misappropriate a portion of his escrow clients' cash to pay himself and others, and with the remainder, purchase the volatile and illiquid SBA COOFs described above (see ¶¶ 29-31 above).  Brenner never disclosed these material facts to his escrow clients before they deposited their cash with him.

68.    Brenner knew or was reckless in not knowing that the SBA COOFs he intended to, and did, purchase with his escrow clients' money were highly risky and illiquid securities.

**Brenner Misleads Broker-Dealers to Conceal and Perpetuate His Fraudulent
Scheme of Speculative Securities Trading with His Escrow Clients' Deposits.**

69.    To engage in this undisclosed trading, Brenner opened brokerage accounts at three different broker-dealers and exclusively purchased SBA COOFs.  Brenner knowingly concealed from these broker-dealers that he was using escrow client deposits to fund these risky purchases, to avoid scrutiny of his misuse of his escrow clients' money and the unsuitability of the SBA COOFs for them.

70.    Brenner initially opened an account in the name of his firm, "Christopher Brenner, P.C.," with Broker-Dealer B, in August 2011.  Brenner's registered representative at Broker-Dealer B told him at the outset that the SBA COOFs were not guaranteed and were illiquid.

71.    Consistent with that warning, Brenner described on his account-opening form that his risk exposure was "aggressive" and "speculative" and his objective was "growth" – while leaving unselected on the form the only available objective consistent with his stated

representations to escrow clients: "Preservation of Capital." Brenner never disclosed to his escrow clients that he would open, or that he had opened, a trading account with the stated objective of speculating with their money.

72.     Brenner also falsely represented on the account-opening form that the funds in his account were derived from both his "investments" and "escrow funds." However, as Brenner knew, *all* of the funds that Brenner deposited into his account at Broker-Dealer B (totaling $2,349,550 during the period September 27, 2011 through November 29, 2011) were obtained entirely from his escrow clients and used to purchase the SBA COOFs**.**

73.     As with Rust, in connection with each order to buy the SBA COOFs through Broker-Dealer B, Brenner provided Broker-Dealer B written forms, in which Brenner explicitly acknowledged that the securities he was purchasing were "complex instruments" that could be "volatile and illiquid in adverse market conditions." In each of these written acknowledgments, Brenner also acknowledged receiving the June 24, 2010 PPM for the 2010 SBA COOFs. Each of Brenner's acknowledgments to Broker-Dealer B represented that he (Brenner) was an "accredited investor" with a yearly income of over "$200,000 for the past 2 years" and with a net worth exceeding $1 million. Brenner's statements were knowingly and materially misleading to Broker-Dealer B because they concealed the true beneficiaries of the account – Brenner's escrow clients.

74.     Brenner did not share these transaction forms with his escrow clients and did not disclose the riskiness and illiquidity of these investments to his escrow clients before he purchased the SBA COOFs.

75.     Brenner also knew that these securities were risky and illiquid because, at the time he became escrow agent for his escrow clients, he was aware of the difficulty Rust was facing in liquidating the SBA COOFs at the prices Rust had paid for them, a fact that Brenner failed to disclose to the new escrow clients he recruited into Atlantic's program.

76.     During the period September 27, 2011 through November 29, 2011, Brenner deposited into his account with Broker-Dealer B funds from at least six different escrow clients, located in Littleton, Colorado, Houston, Texas, Tustin, California, Houma, Louisiana, and Virginia Beach, Virginia, totaling $2,349,550, which he used to purchase 4,247,250,000 units of the 2010 SBA COOFs for a total purchase price of $2,337,982 during that same period.

77.     Brenner received contemporaneous written trade confirmations for these purchases, each of which disclosed that these securities derivatives were not rated.

78.     In connection with these deposits and Brenner's purchases of the 2010 SBA COOFs, Broker-Dealer B insisted on obtaining from Brenner representations as to the source of funds used in these transactions.  Although the source of the funds Brenner used was entirely his escrow clients' deposits, Brenner lied to Broker-Dealer B in writing on four separate occasions from September 28, 2011 through November 29, 2011, falsely stating that the sources of the funds were exclusively "law firm assets," "assets of my professional corporation," or "company funds/assets."

79.     In December 2011, Broker-Dealer B advised Brenner that it could no longer handle his account because it had learned of a prior injunction against Brenner by the Colorado Division of Securities for his violation of Colorado securities laws.

80.     Brenner then sought to open new securities accounts at other broker-dealers and continued to mislead these other broker-dealers as to the source of the funds in his account, so as to continue to be able to perpetrate his fraud undetected.

81.     After two unsuccessful attempts to transfer the 2010 SBA COOFs to other broker-dealers, Brenner opened a securities account at a broker-dealer with its principal place of business in in New York, New York, "Broker-Dealer C," on December 20, 2011.  To avoid scrutiny by Broker-Dealer C into the unlawful trading he intended to engage in with his escrow clients' money, Brenner knowingly or recklessly and falsely represented to Broker-Dealer C in a letter dated December 20, 2011 that the proposed account is "being opened for the purpose of investing the firm's assets," "is not an escrow or trust account," and "will not contain client funds."

82.     That same day, Brenner instructed Broker-Dealer B to transfer his entire position in the 2010 IOTA SBA COOFs (4,247,250,000 units originally purchased with escrow client funds (see ¶ 76 above) to his new account at Broker-Dealer C.  The securities were received into Brenner's account with Broker-Dealer C on December 21, 2011, and Brenner withdrew the total interest earned ($39,384.67) to his bank account.

83.     In January 2012, Brenner opened a third account to trade SBA COOFs with his escrow clients' money at a broker-dealer with its principal place of business in New York, New York ("Broker-Dealer D"), to which he transferred all the 2010 SBA COOFs he had previously purchased with Broker-Dealer B.

84.     As with Broker-Dealer B and Broker-Dealer C, Brenner sought to avoid scrutiny by Broker-Dealer D of his unlawful trading in speculative securities derivatives with his escrow clients' funds and to assure it of his authority and capacity to trade in such risky securities.

85.     Thus, in a January 20, 2012 letter to Broker-Dealer D concerning his new account application, Brenner represented that "my firm owns approximately $4.2 billion face value of SBA-issued bonds," which he claimed to "hold … because of the interest income and because certain financial institutions and other parties are willing to accept these securities as collateral for loans, the proceeds of which are applied to various business ventures."  Brenner's statement was knowingly or recklessly false and misleading, as Brenner's firm did not "own" the securities. They were purchased with his escrow clients' money – a fact he never disclosed to Broker-Dealer D.

86.     Brenner's registered representative at Broker-Dealer D told Brenner at the time he opened his account that the SBA COOFs were risky, not guaranteed, and had limited liquidity. Brenner also received written trade confirmations for his purchases of SBA COOFs, which also stated that the securities are "not rated" and that "yields vary based on asset prepay."

87.     Notwithstanding this latest warning, Brenner in February 2012, in addition to transferring his entire position in the SBA COOFs to Broker-Dealer D, also used approximately $470,000 of newly-recruited escrow deposits from at least five new escrow clients (located in Conroe, Texas, Denver, North Carolina, San Antonio, Texas, Pearland, Texas, and Greenwood Village, Colorado), to purchase another 1,370,000,000 units of the 2011 SBA COOFs through Broker-Dealer D in New York, New York.

**Brenner Secretly Misappropriates Escrow Clients' Deposits For Himself and Others.**

88.    Brenner's Cash Escrow Agreements represented that Brenner would hold their deposits, or use them solely to purchase safe and liquid securities, and that he would take no compensation or fees from the escrow deposits he received except for nominal fees for wire transactions and similar charges.  Brenner, however, intended to misappropriate substantial portions of his escrow clients' deposits for himself, Individual X and others, and he had also separately and secretly agreed with Individual X to share in the "interest income" and trading "profits" from the escrow deposits they obtained – facts Brenner never disclosed to his escrow clients.

89.    For example, during the period September 2, 2011 through October 7, 2011, Brenner induced four escrow clients (located in Houston, Texas, Spring, Texas, Littleton, Colorado, and Tustin, California) to deposit a total of $825,000 with Brenner, which he first deposited in his bank, with its principal place of business in New York, New York.

90.    Brenner transferred $769,550 of these funds to Broker-Dealer B to purchase the 2010 series SBA COOFs discussed above, and he diverted the $50,000 balance to himself, Individual X and others without disclosure to his escrow clients.

91.    On October 13, 2011, Escrow Client H deposited $592,350 into Brenner's bank account (see ¶ 65(b) above).  The following day, Brenner transferred only $430,000 of the $592,350 to Broker-Dealer B.  Without disclosure to Escrow Client H, Brenner diverted $73,000 of the initial deposit for himself, Individual X and others.

92.     Brenner continued to misappropriate funds from escrow clients in this manner repeatedly between September 2011 and July 2012 and made payments to himself, totaling approximately $105,000, and payments to Individual X and others, totaling at least approximately $490,000.

**Brenner Secretly Uses New Escrow Client Deposits to Repay Old Escrow Clients.**

93.     By January 2012, Atlantic had (as it had with Rust) failed to procure any loan funding for any of Brenner's escrow clients, and Brenner's escrow clients began demanding the return of their deposits.  Brenner was unable to do so, because he had either misappropriated his escrow clients' money outright or had purchased the risky SBA COOFs he could not sell or preferred to hold to generate interest income for himself and others.  By this time at the latest, Brenner knew that the only realistic way earlier escrow clients could get any of their money back was through the recruitment of new escrow client money – a fact that he knowingly or recklessly withheld at all times from his existing and new escrow clients.

94.     For example, in a January 9, 2012 email to Brenner concerning Brenner's earlier escrow client, who was demanding reimbursement, Individual X told Brenner that Rust "doesn't have a client now to buy bonds."  Brenner understood the significance of this fact, responding: "What does this say about our ability to sell the bonds, if necessary?"  Brenner then recruited five new escrow clients, and $1.46 million in deposits, knowingly or recklessly omitting to tell them that, to date, Atlantic had been unable (or never intended) to procure any loan funding for any prior escrow clients, or of his own concerns about the illiquidity of the SBA COOFs.  He did so not only so that he could continue to misappropriate funds for himself, but also, and contrary to

what he told these new escrow clients, so that he could use their deposits to reimburse earlier depositors. Of this $1.46 million in newly-recruited escrow deposits, Brenner used at least $500,000 to repay earlier depositors without any disclosure to his new escrow clients.

95.     Brenner, in fact, actively sought to conceal this unlawful conduct through knowing or reckless misrepresentations. For example, on April 16, 2012, Brenner notified in writing an escrow client located in Paderborn, Germany ("Escrow Client I") (whose deposit was actually provided by family friends located in Lee Summit, Missouri), and an another escrow client located in Weimar, Texas ("Escrow Client J"), that their funds, originally deposited on February 8, 2012 and March 22, 2012, totaling $255,000, had been transferred to an "investment account for the purpose of acquiring the securities necessary to fund and collateralize" a loan.

96.     Brenner's statements were lies. Brenner did not transfer the funds to an investment account, nor did he purchase any securities with their money. Rather, he used all of their money to repay earlier escrow clients who had demanded the return of their deposits when Atlantic did not procure their loans.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)

97.     The Commission realleges and incorporates by reference as if fully set forth herein paragraphs 1 through 96 of this Complaint.

98.     Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have employed

devices, schemes, or artifices to defraud; have made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and have engaged in acts, practices, or courses of businesses which operate or would operate as a fraud or deceit upon persons.

99.     By reason of the conduct described above, Defendants directly and indirectly have violated, and, unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

A Final Judgment finding that the Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein;

### II.

A Final Judgment permanently, restraining and enjoining the Defendants and their officers, agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing violations and future violations of each of the securities laws and rules promulgated thereunder.

### III.

A Final Judgment directing the Defendants to disgorge their ill-gotten gains, plus

prejudgment interest thereon;

### IV.

A Final Judgment directing Defendants to pay civil money penalties pursuant to Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

### V.

Such other and further relief the Court deems just and proper.

Dated:  May 13, 2016
         New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____
         Andrew M. Calamari
         Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0148 (Primoff)
Email: primoffr@sec.gov

Of Counsel:

Lara S. Mehraban
Valerie A. Szczepanik
Richard G. Primoff
Daphna A. Waxman*
Tuongvy Le

* Not admitted in SDNY.