UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| - against - | 16 Civ. 03573 (ER) |
| JAY MAC RUST and CHRISTOPHER K. BRENNER, | ECF CASE |
| Defendants. | |

------------------------------------------------------------------------x

### DECLARATION OF TUONGVY LE IN SUPPORT OF PLAINTIFF'S MOTION FOR MONETARY RELIEF AGAINST DEFENDANT CHRISTOPHER K. BRENNER

I, Tuongvy Le, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.	I am a member of the bar of this Court and an attorney for Plaintiff Securities and Exchange Commission (the "Commission"). I make this declaration in support of the Commission's motion for monetary relief against Defendant Christopher K. Brenner ("Brenner"). I was one of the staff attorneys for the Commission on the investigation that preceded the filing of the Complaint, and I make this declaration based upon my personal knowledge, upon information and documents obtained by the Commission during its investigation of this matter and during this litigation, and on information and analyses provided to me by members of the staff of the Commission.

1

2. The Commission commenced this action on May 13, 2016 with the filing of its Complaint ("Cmplt.") against Brenner and Defendant Jay Mac Rust ("Rust") (Docket Entry ("DE") 1, Exh. 1 hereto), alleging that each of them violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

3. On June 9, 2017, the Court entered partial judgment on consent (the "Judgment") against Brenner. DE 37 (Exh. 2 hereto). The Judgment, among other things, (1) permanently enjoined Brenner from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder; and (2) directed that Brenner "shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section (21)(d)(3) of the Exchange Act," and that the Court "shall determine the amounts of the disgorgement and civil penalty upon motion of the Commission."

4. The Judgment also directed that in connection with the Commission's motion for monetary relief, "(a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards

for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure."[1]

### **Brenner Defrauded Escrow Clients**

5.     This case involves a fraudulent commercial loan scheme orchestrated by Lambert Vander Tuig (Individual X in the Complaint) and his alter ego Atlantic Rim Funding ("Atlantic"), who enlisted two attorneys, Defendants Rust and Brenner, to act (successively) as his "escrow agents" in a scheme to defraud 29 escrow clients of approximately $13.8 million from December 2010 to March 2012.  Cmplt. ¶ 1. Brenner, for his part, defrauded at least 15 of these clients out of approximately $3.4 million, after agreeing in August 2011 to replace Rust as Tuig's and Atlantic's attorney and escrow agent for the loan transactions between Atlantic and its clients.  *See* Cmplt. ¶¶ 1-8, 56-57.

6.     Brenner, like Rust, assured prospective clients that if they deposited cash equal to ten percent of their desired loan amounts with Brenner acting as an escrow agent, Brenner would either hold the cash in escrow, or use the cash to purchase safe and liquid securities that would be leveraged to obtain the loans.  *See id.* at ¶¶ 57-58, 61, 64.  Brenner did so knowing that as an attorney, he played an important role in falsely allaying any concerns by prospective depositors about the safety of their funds.  Cmplt. ¶ 58.  Indeed, he prepared written material that he knew would be used for this purpose.[2]

---

[1]     Brenner also consented to the entry, on June 21, 2017, of an Order of the Commission pursuant to Rule 102(e)(3)(i) of its Rules of Practice, suspending Brenner from appearing or practicing before the Commission as an attorney or accountant.  *See* Exh. 3 hereto.

[2]     *See, e.g.,* Exh. 4 hereto (September 7, 2011 email from Intermediary A requesting Brenner provide material for prospective depositors detailing "how safe and untouched their

7. Brenner had his escrow clients sign "Cash Escrow Agreements" with him (a representative example of which is attached hereto as Exhibit 6). These disclosed that the only compensation Brenner would receive from escrowed funds were nominal transaction-related fees (*i.e.*, $50 and $30 for transaction and wire transfer fees, *see* Exh. 6 at SEC-21AP-E-0000095), and, further, that the securities obtained with their funds, ostensibly to obtain the desired commercial loans, would be "backed by the United States Government," and which Brenner would obtain and hold for the client. Brenner also falsely represented to clients, in phone calls and in writing, that their deposits would be safe from loss pending the conclusion of the loan-funding process, never disclosing that he would be misappropriating substantial portions of those deposits for himself, Atlantic or its associates, or that he would use the remainder of those funds to purchase risky, illiquid securities. *See* Cmplt. ¶ 65*; see also, e.g.*, Exh. 4 (a letter from Brenner to a prospective client stating that he used the client deposits to purchase "SBA Collateralized Mortgage Obligations" or "similar, AAA government-backed securities").

8. The only securities Brenner purchased with his clients' money were risky and illiquid securities known as "SBA Confirmation of Originator Fee Certificates," also known as "SBA COOFs," *see* Cmplt. ¶¶ 29-31, 67, through various brokerage accounts at three different broker-dealers, *see id.* at ¶ 69. These derivatives are interest-only strips that entitle its holders only to a portion of the monthly interest "stripped" from the SBA-guaranteed portion of a

---

deposit will be until funding"); Exh. 5 hereto (Brenner's September 20 response, on his law firm letterhead, emphasizing that "[a] critical element of the funding process is the protection of the borrower's escrow funds."

specified, underlying loan. They carry no meaningful guarantee, nor any re-payment of principal (they are, after all, "interest-only" strips), and they are subject to substantial fluctuations in value, including the risk of total loss because of (among other things), changes in interest and pre-payment rates. Cmplt. ¶ 30.

9. Brenner knew these instruments were risky and illiquid. From the inception of his role in this scheme, he was already aware that Rust had been facing difficulty in liquidating the SBA COOFs at the prices he had paid for them, although Brenner never disclosed this to his clients. Cmplt. ¶ 75. The registered representatives at his broker-dealers, first Tradespot Markets Inc. ("Tradespot") (Broker-Dealer B in the Complaint), and then Odeon Capital Group, LLC ("Odeon") ("Broker-Dealer D" in the Complaint)), also warned him that the SBA COOFs were not guaranteed and were illiquid. *See* Cmplt. ¶¶ 70, 86.

10. And each time Brenner placed an order to buy SBA COOFs through Tradespot, Tradespot required that he acknowledge in writing that the securities were "complex instruments" that could be "volatile and illiquid in adverse market conditions" and that he had received the Private Placement Memorandum ("PPM") for the securities. Exh. 7. The PPM, among other disclosures about the riskiness of the instruments, also disclosed that they would not be rated when issued. *See* Cmplt. ¶ 31, 73; *see also* Exh. 8 at SEC-TRADESPOT-E-0007712 (October 20, 2011 email from Mark Beloyan at Tradespot to Brenner, enclosing PPM).[3]

---

[3] Brenner also received trade confirmations regularly from Odeon that warned him the SBA COOFs were "not rated," and that "yields vary based on asset prepay." Cmplt. ¶ 86.

11.     Brenner's consciousness of the riskiness of the SBA COOFs is also demonstrated by his self-designation of his risk profile on his account opening forms as "aggressive" and "speculative" (something else he never disclosed to his escrow clients). Cmplt. ¶ 71; Exh. 9. To avoid scrutiny from Tradespot and Odeon into his use of escrow funds for speculative trading, Brenner falsely misrepresented to them that the source of funds for these trades was his own money. *See* Cmplt. ¶¶ 72, 78.[4] Odeon, for its part, insisted on a letter from Brenner assuring it that he was aware of and capable of handling the risks of his speculative trading, and Brenner, in response, wrote Odeon a letter falsely claiming ownership of the SBA COOFs, while concealing that they were acquired with and for the benefit of escrow clients – material misstatements that would have caused Odeon to refuse to execute Brenner's trades in the SBA COOFs. *See* Exh. DE 26 (Exh. 12 hereto) (Matthew Van Alstyne Declaration) ¶¶ 3-6.

12.     As detailed below (*see* ¶¶ 14-22, *infra*, and Cmplt. ¶¶ 59, 88-9), Brenner, pursuant to his secret agreement with Tuig, began secretly misappropriating substantial portions of his clients' funds from the outset, ultimately stealing $562,976 from them – $105,297 of which he kept for himself, and $457,679 of which he sent to his Atlantic associates. In addition, Brenner never disclosed this theft to his escrow clients, and actively sought to conceal it from them. For

---

[4]     Brenner repeatedly sent Tradespot letters knowingly and falsely representing that the source of the funds he was using for his trades in the SBA COOFs were from "law firm assets," "assets of my professional corporation," or "company funds/assets." Cmplt. ¶ 78, Exh. 10 hereto. He also lied to JP Morgan Chase ("Chase") (Broker-Dealer C in the Complaint), falsely and knowingly representing in a December 20, 2011 letter that his new account "is not an escrow or trust account" and "will not contain client funds," when in fact the only funds that would be used to trade were client escrow funds. *See* Cmplt. ¶ 81; Exhibit 11 hereto.

example, when clients confronted him with accusations that he had been embezzling funds, Brenner responded with false denials. *See, e.g.,* Exh. 13 (February 14, 2013 email exchange between escrow client and Brenner, in which Brenner responds that he has "no idea what someone means by money 'disappearing' from the escrow account"); Exh. 14 (June 13, 2012 email from Brenner to other escrow client, complaining of accusations that he was "embezzling and misappropriating" funds).

13.     Brenner also provided misleading testimony in a private action brought by some of his clients, to conceal his wrongdoing. Although he testified that the "bonds" he purchased with his clients' money, and the interest income generated by them, belonged to his clients, he never disclosed that he had misappropriated those funds.[5] On the contrary, Brenner testified that he never received any compensation other than the nominal fees he disclosed in the Cash Escrow Agreement, and that although he had separately and secretly agreed with Tuig (a/k/a Kennedy) that he would receive a five percent share of Atlantic's "net profit," that was only to occur if Atlantic came through with the loans and the escrow deposits were already returned – which, he claimed, never happened.[6] Brenner later admitted to the Commission during its investigation, in

---

[5]     *See* March 14, 2013 Hearing Transcript in *Franz Road Business Park v. Mark Creighton, et al.* (Galveston Co. Texas) (12 CV 1715) ("Franz Road Action"), relevant pages of which are annexed hereto as Exhibit 15, at 74:21-76:12, 135:21-137:16 (Brenner testifies that his clients were equitable owners of the "bonds" and the "accrued interest" on them); *see also* Transcript of Brenner Deposition Testimony in Franz Road Action ("Brenner Dep. Tr."), relevant pages of which are annexed hereto as Exh. 16, at 82:23-83:10.

[6]     *See* Brenner Dep. Tr. [Exh. 16 hereto] at 27:8-28:19; 78:15-22 (agreement with Tuig was for "five percent of whatever monies were left to Atlantic Rim after they completely funded all

March 2015, however, that he *had* received additional "compensation" under his agreement with Tuig, that this "compensation" was not contingent on the consummation of Atlantic's loans, or any "surplus" proceeds, but rather consisted of him appropriating interest on the bonds, which actually belonged to his clients – and none of which he disclosed to his escrow clients.  *See* March 31, 2015 Brenner SEC Investigative Testimony (Exh. 17 hereto) at 58:1-62:19.

**Brenner's Misappropriation of His Escrow Clients' Funds**

14.     As set forth below, based on my review of Brenner's bank account statements produced during the Commission's investigation and information and analyses provided to me by members of the Commission staff, Brenner, from September 2011 through March 2011, induced clients to deposit a total of $3,355,850 into several purported escrow accounts he maintained at JP Morgan Chase & Co. ("JPMC").  Cmplt ¶ 60.  Not a single escrow client ever received a commercial loan as a result of entrusting their deposits with Brenner.  Cmplt. ¶ 6.

15.     As also set forth below, Brenner secretly misappropriated more than $562,976 of his clients' escrow deposits entrusted to him, from September 2011 to July 2012.  Of this amount, Brenner directed approximately $105, 297 to himself and $457,679 to Atlantic associates.  Brenner made some of these unlawful transfers directly from the JPMC escrow accounts to his personal accounts, and to those of his Atlantic associates.  He also made a substantial number of these unlawful transfers by first sending funds from the JPMC escrow accounts to another account he established and controlled at JPMC, in the name of Capital Trust

---

projects and returned all escrow deposits").

Funding, LLC ("Capital Trust") (and whose statements were sent to Brenner's address), and then transferring funds from that account to himself and others.

## JPMC Accounts

16. From September 20, 2011 through March 22, 2012, Brenner received a total of $3,355,850 in deposits from his escrow clients (and an additional $635,000 in escrow deposits transferred from Rust, when Brenner agreed to replace him as escrow agent, Cmplt. ¶ 60), into three accounts he controlled at JPMorgan Chase & Co. ("JPMC"): Account Nos. XXXXX1878, XXXXX9256, and XXXXX9314), as set forth in Table 1 below:

Table 1     Deposits from Escrow Clients into JPMC Accounts[7]

| Account No. | Date | Amount | Description |
|---|---|---|---|
| XXXXX1878 | 9/02/11 | *$150,000* | Transfer from Rust |
| XXXXX1878 | 9/20/11 | $140,000 | Deposit from ASL Hospitality |
| XXXXX1878 | 9/26/11 | *$300,000* | Transfer from Rust |
| XXXXX1878 | 9/29/11 | *$185,000* | Transfer from Rust[8] |
| XXXXX1878 | 9/30/11 | $50,000 | Deposit from Northgate Family Church |
| XXXXX9256 | 10/12/11 | $592,350 | Deposit from Church Development Financial Services |
| XXXXX9314 | 11/04/11 | $71,400 | Deposit from Living World Assembly |
| XXXXX9314 | 11/10/11 | $500,000 | Deposit from Shamrock Mgmt, LLC |
| XXXXX9314 | 11/22/11 | $60,000 | Deposit from Christ Church Denver |
| XXXXX1878 | 11/29/11 | $190,000 | Deposit from ET Energy LLC |
| XXXXX9314 | 11/30/11 | $50,000 | Deposit from Grace Tabernacle |
| XXXXX1878 | 12/21/11 | $200,000 | Deposit from Realbright |

---

[7] The full account numbers for these and the other accounts at issue have been redacted pursuant to Fed. R. Civ. P. 5.2. This information (and the account statements themselves) are available for review by the Court.

[8] This entry, and the entries dated September 2 and 26, 2011, represent escrow funds previously held by Rust, and for which Brenner agreed to act as escrow agent in September 2011. *See* Cmplt. ¶ 60.

| Account No. | Date | Amount | Description |
|---|---|---|---|
| XXXXX9314 | 12/23/11 | $42,100 | Deposit from Ette Enterprises |
| XXXXX9314 | 1/19/12 | $610,000 | Deposit from 21st Arlington Property, LLC |
| XXXXX9314 | 2/06/12 | $250,000 | Deposit from Costa Rica Choice Investments |
| XXXXX9314 | 2/08/12 | $120,000 | Deposit from Capulet Cube |
| XXXXX9314 | 2/14/12 | $345,000 | Deposit from S&M Coal |
| XXXXX9314 | 3/22/12 | $135,000 | Deposit from Days Inn/Universal Financial Group |
|  | **TOTAL** | **$3,990,850** |  |

17. As early as September 29, 2011, and continuing through October 13, 2011, Brenner secretly paid himself $24,000 from JPMC Account No. XXXXX1878, as set forth below in Table 2.

**Table 2    Brenner's Payments to Himself from JPMC Account No. XX1878**

| Account No. | Date | Amount | Description |
|---|---|---|---|
| 963851878 | 9/29/11 | $2,000 | Payment to Brenner |
| 963851878 | 9/30/11 | $10,000 | Payment to Brenner |
| 963851878 | 10/13/11 | $2,000 | Payment to Brenner |
| 963851878 | 10/13/11 | $10,000 | Payment to Brenner |
|  | **TOTAL** | **$24,000** |  |

18. From September 27, 2011 through June 13, 2012, Brenner secretly paid $117,065 to the following associates of Tuig and Atlantic: Duane Jordan, Jada Jordan, Debora Creighton, Abernathy, Randolph McCreedy, and MDC LLC from JPMC Account Nos. XXXXX1878 and XXXXX9314, as set forth below in Table 3.

**Table 3    Brenner's Payments to Tuig/Atlantic Associates From JPMC Accounts**

| Account No. | Date | Amount | Description |
|---|---|---|---|
| XXXXX1878 | 9/27/11 | $7,000 | Payment to Duane Jordan |
| XXXXX1878 | 9/27/11 | $7,000 | Payment to Jada Jordan |
| XXXXX1878 | 9/27/11 | $6,000 | Payment to Deborah Creighton |
| XXXXX1878 | 9/29/11 | $6,000 | Payment to Creighton |
| XXXXX1878 | 10/04/11 | $6,000 | Payment to Creighton |
| XXXXX1878 | 10/06/11 | $6,000 | Payment to Creighton |

| Account No. | Date | Amount | Description |
|---|---|---|---|
| XXXXX1878 | 10/13/11 | $6,000 | Payment to Creighton |
| XXXXX1878 | 10/13/11 | $6,000 | Payment to Duane Jordan |
| XXXXX1878 | 10/13/11 | $6,000 | Payment to Jada Jordan |
| XXXXX1878 | 10/14/11 | $6,000 | Payment to Deborah Creighton |
| XXXXX1878 | 10/14/11 | $12,000 | Payment to Creighton |
| XXXXX9256 | 10/17/11 | $10,000 | Payment to Randolph McCreedy |
| XXXXX1878 | 10/24/11 | $3,500 | Payment to Abernathy |
| XXXXX9256 | 11/14/11 | $15,000 | Payment to Randolph McCreedy |
| XXXXX1878 | 6/06/12 | $3,576 | Payment to MDC LLC |
| XXXXX1878 | 6/13/12 | $11,000 | Payment to MDC LLC |
| | TOTAL | $117,076 | |

19.     From September 27, 2011 through May 8, 2013, Brenner transferred a total of only $2,521,273 out of the $3,990,850 in escrow deposits he had received, from the JPMC bank accounts to his brokerage accounts at Tradespot, Odeon, and JPMC, in order to purchase the SBA COOFs, as set forth in Table 4 below.

**Table 4        Transfers to Brokerage Accounts from JPMC Accounts**

| Account No. | Date | Amount | Description |
|---|---|---|---|
| XXXXX1878 | 9/27/11 | $300,000 | Transfer to Tradespot |
| XXXXX1878 | 9/29/11 | $72,000 | Transfer to Tradespot |
| XXXXX1878 | 10/06/11 | $287,550 | Transfer to Tradespot |
| XXXXX1878 | 10/07/11 | $10,000 | Transfer to Tradespot |
| XXXXX9314 | 11/15/11 | $505,000 | Transfer to Tradespot |
| XXXXX1878 | 12/22/11 | $120,000 | Transfer to Tradespot |
| XXXXX9314 | 2/07/12 | $715,000 | Transfer to Odeon |
| XXXXX1878 | 4/29/13 | $456,832 | Transfer to JPMC Brokerage Account |
| XXXXX1878 | 5/08/13 | $54,891 | Transfer to JPMC Brokerage Account |
| | TOTAL | $2,521,273 | |

20.     From October 31, 2011 through June 29, 2012, as set forth in Table 5 below, Brenner transferred $443,695 of the client escrow deposits from the JPMC accounts to the Capital Trust Funding Account No. XXXXX9116 at JPMC.

**Capital Trust Funding Account**

Table 5    Transfers from JPMC Escrow Accounts to Capital Trust Funding Account

| Account No. | Date | Amount | Description |
|---|---|---|---|
| XXXXX1878 | 10/31/11 | $35,721 | Transfer to Capital Trust Funding |
| XXXXX9314 | 11/22/11 | $33,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 12/06/11 | $31,338 | Transfer to Capital Trust Funding |
| XXXXX1878 | 12/13/11 | $10,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 12/16/11 | $15,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 1/03/12 | $39,385 | Transfer to Capital Trust Funding |
| XXXXX1878 | 1/20/12 | $20,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 2/06/12 | $32,797 | Transfer to Capital Trust Funding |
| XXXXX1878 | 2/27/12 | $30,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 3/15/12 | $30,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 4/02/12 | $35,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 4/19/12 | $25,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 5/01/12 | $23,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 5/14/12 | $21,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 5/30/12 | $26,000 | Transfer to Capital Trust Funding |
| XXXXX1878 | 6/29/12 | $36,454 | Transfer to Capital Trust Funding |
|  | **TOTAL** | **$443,695** |  |

21.    From October 31, 2011 through June 6, 2012, as set forth in Table 6 below, Brenner secretly paid $81,297 to himself from the Capital Trust Funding account.

Table 6    Brenner's Payments to Himself From Capital Trust Funding Account

| Account No. | Date | Amount | Description |
|---|---|---|---|
| XXXXX9116 | 10/31/11 | $8,400 | Payment to Brenner |
| XXXXX9116 | 11/22/11 | $6,000 | Payment to Brenner |
| XXXXX9116 | 12/06/11 | $5,000 | Payment to Brenner |
| XXXXX9116 | 12/06/11 | $1,286 | Payment to Brenner |
| XXXXX9116 | 12/08/11 | $5,036 | Payment to Brenner |
| XXXXX9116 | 12/16/11 | $4,000 | Payment to Brenner |
| XXXXX9116 | 1/03/12 | $8,500 | Payment to Brenner |
| XXXXX9116 | 1/20/12 | $6,000 | Payment to Brenner |
| XXXXX9116 | 2/06/12 | $7,000 | Payment to Brenner |

| Account No. | Date | Amount | Description |
|---|---|---|---|
| XXXXX9116 | 2/23/12 | $522 | Payment to Brenner |
| XXXXX9116 | 2/27/12 | $7,000 | Payment to Brenner |
| XXXXX9116 | 4/02/12 | $7,000 | Payment to Brenner |
| XXXXX9116 | 4/19/12 | $6,000 | Payment to Brenner |
| XXXXX9116 | 5/01/12 | $3,000 | Payment to Brenner |
| XXXXX9116 | 5/14/12 | $3,000 | Payment to Brenner |
| XXXXX9116 | 5/30/12 | $3,000 | Payment to Brenner |
| XXXXX9116 | 6/06/12 | $553 | Payment to Brenner |
| | **TOTAL** | **$81,297** | |

22.     From October 31, 2011 through July 18, 2012, as set forth in Table 7 below, Brenner secretly paid $340,603 to the following associates of Tuig and Atlantic: Duane Jordan, Jada Jordan, VIP Global, and MDC LLC, from Capital Trust Funding Account No. XXXXX9116.

**Table 7     Brenner's Payments to Atlantic/Tuig Associates From Capital Trust Funding Account**

| Account No. | Date | Amount | Description |
|---|---|---|---|
| XXXXX9116 | 10/31/11 | $8,400 | Payment to MDC LLC |
| XXXXX9116 | 11/01/11 | $8,400 | Payment to Creighton |
| XXXXX9116 | 11/01/11 | $5,000 | Payment to Duane Jordan |
| XXXXX9116 | 11/01/11 | $5,000 | Payment to Jada Jordan |
| XXXXX9116 | 11/22/11 | $10,000 | Payment to MDC LLC |
| XXXXX9116 | 11/22/11 | $10,000 | Payment to MDC LLC |
| XXXXX9116 | 11/23/11 | $3,000 | Payment to Jada Jordan |
| XXXXX9116 | 11/23/11 | $3,000 | Payment to Duane Jordan |
| XXXXX9116 | 12/06/11 | $8,000 | Payment to MDC LLC |
| XXXXX9116 | 12/06/11 | $8,000 | Payment to MDC LLC |
| XXXXX9116 | 12/08/11 | $2,500 | Payment to VIP Global |
| XXXXX9116 | 12/16/11 | $4,000 | Payment to MDC LLC |
| XXXXX9116 | 12/16/11 | $4,000 | Payment to MDC LLC |
| XXXXX9116 | 12/21/11 | $2,000 | Payment to Jada Jordan |
| XXXXX9116 | 1/03/12 | $8,500 | Payment to MDC LLC |
| XXXXX9116 | 1/03/12 | $8,500 | Payment to MDC LLC |
| XXXXX9116 | 1/03/12 | $1,500 | Payment to Jada Jordan |
| XXXXX9116 | 1/20/12 | $10,000 | Payment to MDC LLC |
| XXXXX9116 | 1/20/12 | $10,000 | Payment to MDC LLC |

| XXXXX9116 | 1/25/12 | $4,000 | Payment to Jada Jordan |
|---|---|---|---|
| XXXXX9116 | 2/06/12 | $8,364 | Payment to MDC LLC |
| XXXXX9116 | 2/06/12 | $7,000 | Payment to MDC LLC |
| XXXXX9116 | 2/06/12 | $7,000 | Payment to MDC LLC |
| XXXXX9116 | 2/07/12 | $3,000 | Payment to Jada Jordan |
| XXXXX9116 | 2/27/12 | $7,000 | Payment to MDC LLC |
| XXXXX9116 | 2/27/12 | $7,000 | Payment to MDC LLC |
| XXXXX9116 | 2/28/12 | $3,000 | Payment to Jada Jordan |
| XXXXX9116 | 3/02/12 | $5,061 | Payment to MDC LLC |
| XXXXX9116 | 3/15/12 | $20,000 | Payment to MDC LLC |
| XXXXX9116 | 3/15/12 | $5,000 | Payment to Jada Jordan |
| XXXXX9116 | 4/02/12 | $10,000 | Payment to MDC LLC |
| XXXXX9116 | 4/02/12 | $10,000 | Payment to MDC LLC |
| XXXXX9116 | 4/02/12 | $3,079 | Payment to MDC LLC |
| XXXXX9116 | 4/02/12 | $5,000 | Payment to Jada Jordan |
| XXXXX9116 | 4/19/12 | $20,000 | Payment to MDC LLC |
| XXXXX9116 | 4/19/12 | $3,000 | Payment to Jada Jordan |
| XXXXX9116 | 5/01/12 | $20,000 | Payment to MDC LLC |
| XXXXX9116 | 5/02/12 | $3,000 | Payment to Jada Jordan |
| XXXXX9116 | 5/14/12 | $18,000 | Payment to MDC LLC |
| XXXXX9116 | 5/15/12 | $3,000 | Payment to Jada Jordan |
| XXXXX9116 | 5/30/12 | $20,000 | Payment to MDC LLC |
| XXXXX9116 | 5/30/12 | $3,000 | Payment to Jada Jordan |
| XXXXX9116 | 6/29/12 | $20,000 | Payment to MDC LLC |
| XXXXX9116 | 7/02/12 | $1,500 | Payment to Jada Jordan |
| XXXXX9116 | 7/18/12 | $4,800 | Payment to MDC LLC |
| | **TOTAL** | **$340,603** | |

**Brenner Secretly Uses New Escrow Client Deposits to Repay Earlier Investors**

23.    By March 2012, Atlantic had failed to obtain loan funding for any of its clients, causing clients to demand repayment of their deposits from Brenner. Cmplt. ¶ 6, 93. Because Brenner had either secretly misappropriated those funds, or used them to purchase risky securities that had either declined in value or that he was unable to sell, Brenner was unable to return his clients' deposits, and he began to use newly-obtained client escrow deposits to repay

the deposits of earlier escrow clients, without disclosing this misuse of proceeds to his earlier or new escrow clients. Cmplt. ¶ 93.

24. As illustrated below in Table 8, between November 2011 and February 2012, Brenner received $732,500 in deposits from five escrow clients into his JPMC escrow account. Brenner transferred $505,000 of these deposits to his account at Tradespot, and $33,000 to the Capital Trust Funding account; the balance in the JPMC escrow account at the end of December 2011 was only $185,500. *See* ¶¶ 16-22, *supra*.

**Table 8**

| Account | Date | Debits | Credits | Running Balance | Description |
|---|---|---|---|---|---|
| XXXXX9314 | 11/04/11 | | $71,400 | $71,400 | Deposit from Living World Assembly |
| XXXXX9314 | 11/10/11 | | $500,000 | $571,400 | Deposit from Shamrock Mgmt, LLC |
| XXXXX9314 | 11/15/11 | $505,000 | | $66,400 | Transfer to Tradespot |
| XXXXX9314 | 11/22/11 | | $60,000 | $126,400 | Deposit from Christ Church Denver |
| XXXXX9314 | 11/22/11 | $33,000 | | $93,400 | Transfer to Capital Trust Funding |
| XXXXX9314 | 11/30/11 | | $50,000 | $143,400 | Deposit from Grace Tabernacle |
| XXXXX9314 | 12/23/11 | | $42,100 | $185,500 | Deposit from Ette Enterprises |
| | **TOTAL** | **$538,000** | **$723,500** | | |

25. Then, as illustrated below in Table 9, from January through March 2012, Brenner received $1,460,000 million in deposits from five new escrow clients into the JPMC escrow account. On February 7, 2012, Brenner transferred only $715,000 of these funds to Odeon. He used the remainder to repay earlier escrow clients (Living World, Shamrock Mgmt LLC, Ette

15

Enterprises, Christ Church Denver, Grace Tabernacle), a total of $724,444.  During this period, however, the only sources of the cash in the account were $1.46 million deposited from *new* escrow clients, plus an additional $139,382 that Brenner transferred into the account from another JPMC account (XXXXX1878), a portion of which came from Odeon.

26. Brenner never disclosed to his new or earlier escrow clients that he used new escrow deposits to repay earlier depositors.   On the contrary, Brenner actively sought to deceive his clients about this conduct.  Cmplt. ¶ 93.  For example, on April 16, 2012, Brenner wrote to escrow clients Capulet Cube ("Escrow Client I" in the Complaint) and Days Inn (Escrow Client J" in the Complaint) that their escrow deposits totaling $505,000, originally deposited on February 8 and March 22, 2012, respectively, had been transferred to an "investment account for the purpose of acquiring the securities necessary to fund and collateralize" a loan.  *See* Exhs. 18, 19; Cmplt. ¶95.  As Brenner knew at the time, however, Brenner had made no such transfer. Rather, as noted above, he used their deposits to repay earlier escrow clients who had demanded the return of their deposits after Atlantic failed to procure the promised loans.

Table 9        Payments to Old Escrow Clients Using New Escrow Deposits

| Account | Date | Debits | Credits | Running Balance | Description |
|---|---|---|---|---|---|
| XXXXX9314 | 01/19/12 | | $610,000 | $795,000 | Deposit from 21st Arlington |
| XXXXX9314 | 02/06/12 | | $250,000 | $1,045,500 | Deposit from  Costa Rica Choice |
| XXXXX9314 | 02/07/12 | $715,000 | | $330,500 | Transfer to Odeon |
| XXXXX9314 | 02/08/12 | | $120,000 | $450,500 | Deposit from  Capulet Cube |
| XXXXX9314 | 02/14/12 | | $345,000 | $795,500 | Deposit from S&M Coal |
| XXXXX9314 | 03/07/12 | $71,635 | | $724,100 | Payment to Living World Assembly |
| XXXXX9314 | 03/22/12 | | $100,000 | $824,100 | Deposit from Days Inn/Universal Financial Group |

| XXXXX9314 | 03/22/12 |           | $35,000  | $859,100 | Deposit from Days Inn/Universal Financial Group |
| XXXXX9314 | 04/06/12 | $500,000  |          | $359,100 | Payment to Shamrock Mgmt LLC |
| XXXXX9314 | 04/16/12 |           | $63,125  | $422,225 | Transfer from JPMC Account XXXXX1878 |
| XXXXX9314 | 05/10/12 | $42,259   |          | $380,125 | Payment to Ette Enterprises |
| XXXXX9314 | 05/24/12 | $60,302   |          | $320,125 | Payment to Christ Church Denver |
| XXXXX9314 | 05/29/12 | $50,248   |          | $269,877 | Payment to Grace Tabernacle |
| XXXXX9314 | 06/19/12 |           | $76,257  | $346,134 | Transfer from Odeon |
| XXXXX9314 | 06/19/12 | $346,191  |          | $143     | Payment to S&M Coal |

## Investors' Losses

27.     Brenner's escrow clients collectively deposited approximately $3,335,850 with Brenner (not including those whose deposits were transferred to him from Rust).  *See* Cmplt. ¶ 60.  Based on my review of Brenner's bank and brokerage records produced during the Commission's investigation, Brenner returned only approximately $1,959,471 of these funds.  As a result of the specified misconduct, Brenner's escrow clients collectively suffered losses of at least $1,079,878.

## Calculation of Disgorgement and Prejudgment Interest

28.     As discussed above, Brenner unlawfully defrauded 15 escrow clients, and obtained illicit gains, directly, in the amount of $105, 297 (not including the $457,679 he stole, and directed to associates of Atlantic and Tuig) (*see* Tables 2, 6, *supra*).  In addition to the civil money penalties the Commission asks the Court to order against Brenner for his unlawful conduct, the Commission requests the Court order Brenner to disgorge the $105, 297 Brenner unlawfully received.  *See* Tables 2 and 6, supra.

29. Further, I set forth herein the Commission's calculations of pre-judgment interest on the disgorgement amounts set forth above, using the floating interest rate used by the Internal Revenue Service to determine interest due on underpaid taxes (the "IRS rate"), see 17 C.F.R. § 201.600(b). Beginning those calculations as of August 2012, the first full month after Brenner stopped transferring escrow deposits to himself and others, through the present, I calculate pre-judgment interest on the $105, 297 disgorgement amount to be $19,105.71, which the Commission also requests the Court direct Defendant to pay, calculated as shown above and in Exhibit 19 hereto.

Executed on October 5, 2017
New York, New York

_____
Tuongvy Le